Argued and submitted January 21, reversed May 18, 1981

In the Matter of the Marriage of

DAWSON,
*Appellant,*
*and*
DAWSON,
*Respondent.*

(No. 94760, CA 18840)

628 P2d 449

Linda A. Pedersen, Portland, argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

The custodial mother appeals an order reducing father's child support obligation from $150 to $100 monthly from February through September, 1980. The issue is whether father sustained his burden of proving a material change of circumstances. We review *de novo* and find he has not. ORS 19.125(3). Accordingly, we reverse.

The parties were divorced in January, 1977. One child was born of the marriage. The decree provided father pay $135 monthly child support for one year and $150 monthly thereafter.

In April, 1977, at the urging of the District Attorney's Support Enforcement Division, father signed a wage assignment. Later the same month the wage assignment was terminated because father agreed to pay support voluntarily. In February, 1979, a contempt citation was issued at the request of the District Attorney and in March a contempt hearing was held at which testimony was taken. Father's support arrearages at that time totaled $604. For some reason not disclosed by the record, the matter was continued for 90 days. In June, 1979, father was $1,020 in arrears. A second contempt citation was issued. Father failed to appear, and the court issued a bench warrant for his arrest. In August father appeared and posted bail, which was subsequently forfeited and applied to support arrearages. In January, 1980, a third contempt citation was issued. Father appeared and requested a continuance to file a motion to reduce support. After a consolidated hearing in June, 1980, the trial court found father in contempt but reduced his current support obligation from $150 to $100 monthly for a period of 18 months from February 1, 1980.

Mother filed a motion for a new trial. After a July hearing, the trial court made the following findings:

"The Court has reviewed the evidence and counsels' arguments and finds that it was in error in reducing the child support obligation for a period of eighteen months. The Court, however, cannot say that the respondent was guilty of perjury nor dishonest in his presentation to the Court. The Court viewed the witnesses' demeanor and finds that respondent's explanation of business and financial transactions was credible. Respondents [sic] failure to

comply with his support obligation was, as stated by the Court, contemptuous, however financial records indicate a change of circumstances in respondent's ability to pay the support previously ordered, but that said ability is of a temporary nature requiring a reduction in obligation through September 1, of this year, at which time his prior obligation will be reinstated."

The trial court then modified the decree to reflect that, beginning February 1, 1980, father's support obligation would be reduced to $100 monthly until September 1, 1980, at which time the obligation would return to $150 monthly.

Father is a self-employed dump truck operator. He testified that his adjusted gross income in 1977 was $22,903 but that his adjusted gross income for 1978 was only $4,500. The evidence shows that father reported gross income of $22,353 on his 1978 tax returns, and his bank records indicate he deposited $38,648 in his business checking account the same year. He testified that his adjusted gross income in 1979 was $866 on a gross income of $6,208. The evidence shows that father deposited $23,754 in his business checking account in 1979 and that prior to making those deposits he made cash draws totaling $4,724. The discrepancy between his reported income for 1978-79 and bank deposits and draws for the same period is unexplained by father.

Father was vague concerning his 1980 income.[1] In response to a question about how much he had earned from

---

[1] Father testified:

"Q. How much money have you made through West Coast Grocery part-time for the first three months of this year?

"A. I have no idea.

"Q. Could it be as much as $4200?

"A. For the first three months?

"Q. For the first three months.

"A. I don't think it was that much.

"Q. What do you think it was?

"A. I have no idea. Like I say, until I get my W-2 form at the end of the year, W-4 form, I have no idea.

    * * *

West Coast Grocers for the first three months of 1980, he responded that he had no idea of how much he had earned and that he would not know until he received his W-2 form from the employer at the end of the year. Father worked part-time for West Coast Grocers, earning $10 an hour, from January until April, 1980, when he voluntarily terminated his employment. Father could not recall how much he averaged at his part-time job with West Coast Grocers, but he thought $800 per month was too high. The affidavit of West Coast Grocers indicated father netted approximately $1,000 monthly and that father could have worked more hours but that he chose not to do so because he wished to pursue other employment opportunities.

In April, 1980, he began work as an independent contractor for R.A. Hatch & Co. in Bend. His gross earnings for the two months immediately preceeding the hearing totaled $6,435. When asked how much he was earning at the time of the hearing, he replied, "I don't know. * * * I should be grossing, you know, $3,000."

In February, 1980, the month in which father filed his motion to reduce support, he deposited $3,300 in his business checking account. During the first quarter of 1980, his bank deposits totaled $5,041. Father testified that his work as a self-employed dump truck operator was seasonal and that his best months were April through November.[2]

---

"Q. Mr. Dawson, what is your current situation as far as employment?

"A. I am presently—last month I started a job. I'm getting in probably two, three weeks a month maybe for the next four or five months.

"Q. All right. And do you know what kind of income you will be able to generate from this employment?

"A. I don't know. I should be grossing—At a hundred hours a month I should be grossing, you know, $3,000.

"Q. And what will your net operating expenses be on a monthly basis?

"A. With, say, three weeks out of the month, approximately 2,000 miles a month, we're looking at $700 in fuel. Highway tax, we are looking at $100 a month. Just general maintenance and tires on the truck, they're going to cost me two or $300 month."

[2] In view of this testimony, it is especially difficult to understand the rationale of the trial court in reducing support from February until September.

In November, 1978, father made a credit application to Oregon Trail Savings and Loan. On cross-examination, he testified he falsified portions of this application.[3] At a court hearing on March 16, 1979, father testified he had no money in the bank.

The evidence shows that between February 13 and March 13, 1979, father deposited $3,600 in his business checking account and that on March 16, 1979, father had a balance of $1,386 in that account. In May, 1979, father purchased a tractor for $12,900. He made a down payment of $3,000 cash and financed the balance of $11,713 including interest through Westinghouse Credit Corporation, obligating himself to monthly installment payments of $488. In his credit application, he reported assets of $59,000. In October, 1979, father applied for a $5,400 loan from the United States National Bank. In his credit application he indicated he had monthly take-home pay of $2,000 plus additional monthly earnings of $800 from part-time employment. On cross-examination, father testified that this representation was untruthful.[4]

Father stated that he had $1,000 monthly business expenses when he was working full time, and monthly

---

[3] Father testified:

"Q. I'm going to show you what's been marked Petitioner's Exhibit No. 5 Mr. Dawson. I'm going to ask you if you recognize that as your application to Oregon Trail Savings & Loan?

"A. Yes, I signed it. Yes.

"Q. Mr. Dawson, did you report to them in connection with your request for a loan on the mobile home that your take home pay was $1200 per month?

"A. I could have.

"Q. And that was true at the time you made that statement?

"A. What month was that? No, it wasn't, it was not true.

[4] Father testified:

"Q. Did you personally state and sign a credit application on August 23, 1979, indicating that you had take home pay of $2,000 monthly plus an additional $800 through part-time work at West Coast Grocery?

"A. I did.

"Q. All right. And was that in fact true in August of 1979?

"A. That was not true.

"Q. So you lied on your credit application.

"A. Yes, I did."

personal expenses of $475. However he presented absolutely no evidence other than his own testimony to verify these amounts. His tax, bank and business records and various financial statements were all offered in evidence by mother.

Father had been living with a female companion and her child by a former marriage for several years. She is employed and has a monthly salary $1,960, plus an additional monthly income of $200 representing payments to her on an installment land sales contract.[5]

The burden of proof is on father.[6] *Delf and Delf,* 19 Or App 439, 441, 528 P2d 96 (1974). Our review in this case is *de novo.* We therefore make our independent determination of the issues from the record as a whole. So considered, we conclude that the evidence was not sufficient to establish a change of circumstances.

---

[5] We have previously held that the income of the obligor's new spouse or living companion may be relevant in determining what is "just and proper" support. *Apling and Apling* 26 Or App 367, 370, 552 P2d 567, *rev den* (1976); *Batten and Batten,* 23 Or App 620, 623, 543 P2d 33 (1975). Father has lived with the same companion and her child by a former marriage for several years. She testified her income was sufficient to cover all of their fixed expenses.

"Q. * * * Miss * * *, does your income in a month when Mr. Dawson brings home no income, does your income cover your fixed expenses?

"A. Yes.

"Q. And his?

"A. Yes."

The evidence shows father's companion has contributed toward his support and expenses. From time-to-time she has paid his share of their mobile home and land payments. She paid the balance on his truck and has made monthly payments on his tractor and insurance. She has given and loaned him money over the last few years but she has not kept a record of how much. She gave him the money to retain the lawyer who represented him in these proceedings.

Appellant contends this court would be justified in reversing the trial court's order even without giving consideration to the companion's income. We agree.

[6] Father failed to produce any evidence concerning his income and expenses other than his own testimony. Although the hearing was convened in June, 1980, father did not produce a tax return for the year 1979. In the course of his testimony, father referred to his 1977 and 1978 tax returns, but they are petitioner's exhibits, not his.

As the party with the burden of proof, father should have accurately documented his income and expenses. His cavalier attitude about his burden of proof is illustrated by the following excerpts from his testimony:

## Reversed. Costs to appellant.

"Q. In October of 1979 did you apply for a loan in the amount of $5,400 from the U.S. National Bank?

\* \* \*

"A. I don't—I don't recall. I don't—

\* \* \*

"Q. And when you signed your affidavit in February seeking a reduction in child support, isn't it a fact that you had approximately $1400 in part-time wages from West Coast Grocery?

"A. I—that could be. I don't know at that point.

\* \* \*

"Q. Your roommate, Miss \*\*\*, regularly nets 1156 per month, doesn't she?

"A. I don't know how much money she makes a month.

\* \* \*

"Q. Isn't it true that in a financial statement listed with them [Westinghouse Credit Corporation] you indicated that you had assets of $59,000?

"A. Perhaps."

It would be an understatement to say that father was not prepared to answer even the simplest questions with regard to his income, expenses and assets.